Dwayne **SHORT**, Appellant,

v.

**BLACK & DECKER, INC.,** Appellee.

**No. 09 86 080 CV.**

Court of Appeals of Texas,
Beaumont.

March 5, 1987.

Rehearing Denied April 29, 1987.

Terry P. Ayre, Ayre, Bale and Boss, Houston, Val Kientz, The Law Offices of Doug Cherry, Webster, for appellant.

David E. Bernsen, Benckenstein, Norvell, Bernsen & Nathan, Beaumont, for appellee.

OPINION

BROOKSHIRE, Justice.

Appellant sued for personal injuries alleging negligence, as well as a products liability cause of action. The jury determined that Short was totally at fault. This was found by the jury in Special Issue No. 14 reading:

> "For each party or product found by you to have caused the occurrence, find the percentage cause [sic] by:

| | |
|---|---|
| "Dwayne Short | 100% |
| "Black & Decker, Inc. | 0 % |
| "Total | 100%" |

The jury found no damages for past medical expenses; it found no damages for future medical expenses.

The general damage issue [No. 17] was answered zero as to past and future physical pain and mental anguish, loss of earnings or earning capacity past or future, as well as physical impairment past or future. From a take-nothing judgment against him, Short appeals.

### The Factual Background

Short was employed as a construction foreman, working for Lee Robicheaux. Robicheaux's company was building a Kwik Pantry Convenience Store in Lumberton, Hardin County.

Short testified he had more job experience in constructing steel buildings than his employer. Appellant admitted that he had broad experience as a mechanic, millwright, and welder, being familiar with many types of hand tools. He had worked with and used impact wrenches for about twelve years. Short was responsible for the care and storage of impact wrenches and other tools. Some of the impact wrenches and tools needed repairs during the duration of the job. A frequently needed repair was reconnecting the electrical connection into the handle or grip of the impact wrench when the same cord had become pulled loose or detached.

One day before the accident sued on, Short told Robicheaux he [Short] knew how to repair and reattach or tighten the loose

electrical cord into the handle of an impact wrench. Later, Short took several of this type of wrench to his home for inspection and repair. After returning to the work site, the next day, Short was injured while using an impact wrench. The ground prong on the plug of that same wrench had been removed. Also the grommet, called a strain relief, had been sliced or cut.

At the crucial moment of injury, Short was on a scaffold, tightening or driving in a certain screw, using one of the impact wrenches he had previously repaired at his home the night before.

Short conceded and agreed that he alone connected the impact wrench to the power source or extension cord. He hooked into the power source in a somewhat blind manner, without checking to see if grounding was necessary. He did not check the wrench to determine if it needed additional repairs or connections.

Short was perspiring and placed his moist, sweaty hand or palm on the side of the metal building. He pulled the trigger in the wrench. He sustained a powerful electrical shock, falling from his working platform to the hard ground.

Also, Short testified he knew and realized that grave danger existed in using and powering an ungrounded electrical hand tool, especially if grounding is recommended. Short knew the ground prong was missing.

An expert, Dr. Brennan, was called by Appellant. This expert stated that bad repairs, pinched wire, and lack of or absence of a ground, caused Short's fall and injuries. Dr. Brennan and Mr. Clayton also testified to the effect that Black & Decker had nothing to do with the problems or conditions that caused Short's injuries and damages. Clayton was called by Short. All changes and modifications took place after the completed manufacture of the impact wrench of Black & Decker. The wrench had left the manufacturer's control when the changes and the dangerous condition took place.

In view of the record of conflicting evidence, and in view of the part of the record in which the experts proffered by Short

could have been interpreted by the jury as having virtually agreed with the defense on the issues of defective products, defect in engineering, defect in design, defect in advertising; nevertheless, the Appellant brings two points of error. The first complaint is that the jury's verdict was based on bias, prejudice, and improper motive. Appellant says that the jury argument was calculated to and did cause the jury to return a verdict based on bias, prejudice, or improper motive. We have carefully reviewed the jury's argument of both counsel. Certain pertinent and relevant excerpts are set out; there are:

### The Bias and Prejudice Point Argument of Plaintiff's Counsel

"[MR. AYRE]: ... I ask you why we didn't get to hear the engineer or the committee of engineers or the floor of engineers up there that decided after meeting, meeting and meeting on why this warning was chosen.

"MR. BERNSEN: Your Honor, I am going to object. Mr. Ayre has had this case a long time. He could have taken the deposition of anybody up there.

"MR. AYRE: You know why I—

"BY THE COURT: Just a minute now.

"MR. BERNSEN: He's got the burden of proof.

"BY THE COURT: All right. Let's continue, Mr. Ayre.

"MR. AYRE: Thank you, Your Honor.

"BY THE COURT: You understand?

"MR. AYRE: Yes, sir.

"BY THE COURT: Ladies and gentlemen, you remember the evidence and the testimony. Remember my previous instructions to you. All right, let's proceed.

### Plaintiff's Argument Resumed

"BY MR. AYRE: I think we are going to get some more of that. But that's okay. I apologize to the court.... The reminder wasn't there. It wasn't there because someone decided it wasn't important. That's why we are here.

"You need to decide and you need to tell folks that make those conscious decisions in the buildings up in Maryland—

"MR. BERNSEN: (Interrupting)

"Now, Your Honor—Now, he knows. May we approach the bench?

"BY THE COURT: All right.

"MR. AYRE: Your Honor, this is argument. He is just trying to interrupt my—

"MR. BERNSEN: (Interrupting)

"You know better than that.

"BY THE COURT: All right, gentlemen.

"(WHEREUPON, AT THIS TIME, WITH COUNSEL AT THE BENCH OUT OF THE HEARING OF THE JURY, THE PROCEEDINGS ARE AS FOLLOWS:)

"MR. BERNSEN: (Inaudible)

"MR. AYRE: I won't talk about your engineers any more.

"MR. BERNSEN: You know what you—

"BY THE COURT: All right, gentlemen.

"(WHEREUPON, AT THIS TIME, IN THE HEARING OF THE JURY THE PROCEEDINGS CONTINUE AS FOLLOWS:)

"BY THE COURT: All right, Mr. Ayre, you may proceed.

. . . .

"MR. AYRE: Well, if they decide the other way and make a double insulated tool that they can make cheaper—it doesn't cost them a dime more—wouldn't you think a manufacturer would say, 'Hey, if we sell this one, no one is going to get hurt', or a minimum exposure to injury to death.

"Why—Why was a decision made somewhere along the line not to do that? Profit. That's an easy answer. We all heard that. If you are number one and you sell more than anybody else—

"MR. BERNSEN: (Interrupting)

"Your Honor—

"MR. AYRE: —And you got the market cornered, who cares—

"BY THE COURT: All right.

"MR. BERNSEN: Your Honor, Mr. Ayre, by arguing this, is attempting to get the jury to overcome the issue on bias, prejudice and sympathy, that definition.

"BY THE COURT: All right.

"MR. BERNSEN: He is trying to do that. And he knows what he is doing. I object to it.

"BY THE COURT: The objection will be sustained.

"Ladies and gentlemen, please remember my previous instructions concerning that subject matter.

"Let's proceed, Mr. Ayre.

. . . .

"MR. AYRE: It was important for them to tell you that Dwayne Short who didn't finish junior high school should have gone and found Mr. Robicheaux, searched through that yard and looked at the owner's manual before he started to work.

"If the owner's manual was that important and that critical and that fundamental to this case, would you have liked to have seen it yourself? I would.

"MR. BERNSEN: Your honor, Mr. Ayre knows again—

"I apologize for getting up.

"Mr. Ayre's firm has been provided a copy of that owner's manual, and if he wants to use it—

"MR. AYRE: (Interrupting)

"That's incorrect.

"MR. BERNSEN: That is correct.

"BY THE COURT: All right now, gentlemen. All right now.

"MR. BERNSEN: And you know that.

"BY THE COURT: All right now, gentlemen.

"MR. AYRE: The jury didn't see it.

"BY THE COURT: All right now, gentlemen. Let's proceed. The owner's manual was not produced. Let's move on.

. . . .

"MR. AYRE: But in our system and our legal society that is the only way to catch peoples' attention up in the buildings, in the staffs where they talk about lawsuits, where they talk about improving their

products, where they talk about what juries have said about their products.

"MR. BERNSEN: Your Honor, I have objected and I hate to keep interrupting Mr. Ayre—

"MR. AYRE: I don't like for you to interrupt me.

"MR. BERNSEN: Then follow the court's instructions. He has instructed you not to do that.

"Your Honor, I—

"MR. AYRE: You will have to be the judges—

"BY THE COURT: Gentlemen. Gentlemen.

"MR. AYRE: I'm almost through, Judge.

"BY THE COURT: All right.

"Restrain yourself, gentlemen. Let's proceed.

. . . .

### Defendant's Argument

"MR. BERNSEN: I said, 'remember what I say is not evidence and what Mr. Ayre says is not evidence.' Hold him to that burden because he has the burden of proof.

"He has the burden of proof. By virtue of his own witnesses and his own testimony, he is out of court, and he knows it. He knew it the other day when I—

"MR. AYRE: (Interrupting)

"Your Honor, I—

"BY THE COURT: All right.

"MR. AYRE: —Am going to object to that.

"BY THE COURT: Mr. Bernsen, I think you are getting out of line in undue criticism of Mr. Ayre. Now you may talk about—

"MR. AYRE: (Interrupting)

"I am not out of court at all.

"BY THE COURT: Just a minute now. Sit down. I will not permit criticism of opposing counsel.

"All right, now let's proceed. You may talk about the evidence and the facts of the case but the court will not tolerate—

"MR. BERNSEN: Yes, sir.

"BY THE COURT: —Undue criticism of opposing counsel.

"MR. BERNSEN: Yes, sir. Thank you.

. . . .

"MR. BERNSEN: The cause is out the window and that is the second element of his case. So when he gets up here and tries to tell you or represent to you, 'Oh, there's no problem. There's no problem here.' He knew the law. He knew the law. He was trying to get his witness to mend the testimony there. Well, maybe—

"BY THE COURT: (Interrupting)

"All right now, Mr. Bernsen. I have told you—

"MR. BERNSEN: Excuse me, Your Honor.

"BY THE COURT: —That I do not want you to—

"MR. BERNSEN: Excuse me, Your Honor.

"BY THE COURT: —Make criticism of opposing counsel.

"MR. BERNSEN: Excuse me, Your Honor.

"BY THE COURT: You may discuss the facts in issue in this case. That is the last time I am going to warn you.

"MR. BERNSEN: I apologize.

"BY THE COURT: All right.

"MR. BERNSEN: I was attempting to, Judge, and I apologize.

"BY THE COURT: You talk about the facts in evidence.

"MR. BERNSEN: All right.

"BY THE COURT: And do not criticize opposing counsel.

"MR. BERNSEN: Thank you, Your Honor. I apologize to you.

. . . .

"MR. BERNSEN: The causes as mentioned by Dr. Brennan and Judd Clayton were the bad repair and the ground prong. They said the repair could have been done properly I submit to you if Mr. Short had done it properly. That had nothing to do with anything Black & Decker did.

"Mr. Ayre won't address that. They want to talk about other things.

"The same thing about double insulation, I want to mention that, whether or not it's defective. He told you, he represented to you, 'My expert said that' you will remember....

"MR. AYRE: Excuse me, Your Honor, that's not accurate. He didn't have an expert.

"BY THE COURT: All right. Now, Mr. Bernsen—

"MR. AYRE: That is an absolute blatant—

"BY THE COURT: Just a minute—

"MR. AYRE: —False statement.

"BY THE COURT: —Mr. Ayre.

"I am going to tell you one more time, Mr. Bernsen. This is not Mr. Ayre's lawsuit. This is Mr. Short's lawsuit.

"MR. BERNSEN: Yes, sir.

"BY THE COURT: Please refrain from criticizing opposing counsel. Now you understand my ruling?

"MR. BERNSEN: Yes, sir.

"BY THE COURT: All right. Now that is the last time I am going to say that to you.

"Let's proceed with argument of the facts of this case.

"MR. BERNSEN: Yes, sir.

....

"MR. BERNSEN: I will say this about this matter. I have raised my voice. I have gotten excited and Judge has had to call me down. I apologize to him again. I apologize to Mr. Ayre and everybody else. I get excited. That's the way I am. I apologize to you all for doing that.

"I have tried to try this lawsuit the best way I could. I tried to get them to try it on the facts and not try to evoke sympathy or bias in this thing but try it on the facts.

"I have jumped up and interrupted Mr. Ayre and I apologize to you all for it. All I will say is I am a lot younger than Mr. Ayre. I have not tried as many lawsuits as he has and I am not as experienced as he is. I apologize you know for me getting emotional.

"When you live a case and you work a case and you have strong feelings about a case, it's hard not to get involved. I'm not that way. I'm not a calm person.

"When I played sports in high school and college I was the same way. You get pumped up and you get going and it's kind of hard to calm people down. I'm like that.

"If in the course of the trial I have jumped up and I have offended anybody, please, I would appreciate your taking me aside and saying, 'David, you shouldn't have said that' or 'You shouldn't have done that.' Don't hold it against my client for something that I did personally. I am down here doing the best I can."

There were other heated exchanges and arguments and objections made during the plaintiff's closing argument, one of which is as follows:

"MR. AYRE: You do what any bright company that has a position in commerce that is unassailable does. You say nothing, because if you say nothing, you have a chance. If you say one sentence from the witness stand, you are taking a big chance. They elected not to do that.

"MR. BERNSEN: Your Honor, this is not an issue and not in evidence. I mean we are talking about the facts.

"MR. AYRE: You brought it up.

"BY THE COURT: All right, gentlemen.

"MR. BERNSEN: I want to object to that as not being in the evidence. There has been no testimony as to that from the witness stand.

"BY THE COURT: All right.

"MR. AYRE: Your Honor, the jury heard the facts.

"BY THE COURT: All right, gentlemen. Let's proceed. The objection is overruled. Let's proceed.

....

"MR. AYRE: Facts—He wants to talk about facts. You didn't get facts because he didn't want you to have facts because in this case from day one the decision was made—and it is the best strategy in the world—when you've got a cripple, who is not the brightest human being, who is not

the most articulate human being, who can't remember every single, subtle nuance about his life—the trick and the strategy when you got a lawsuit like that is a conspiracy of silence. You say nothing. You do nothing.

"MR. BERNSEN: Your Honor, I am going to have to protest. I am going to ask the court to instruct the jury that none of this is in evidence. Mr. Ayre knows better.

"MR. AYRE: That's right, it isn't in evidence because you didn't bring any.

"BY THE COURT: All right now, gentlemen.

"MR. AYRE: That's just my point.

"MR. BERNSEN: Judge, he's wrong and I ask you to instruct—he's wrong and knows it.

"BY THE COURT: (Interrupting) All right, ladies and gentlemen, please step in the jury room.

"(WHEREUPON, AT THIS TIME THE JURY RETIRED TO THE JURY ROOM AND THE PROCEEDINGS WITHOUT THE JURY CONTINUED AS FOLLOWS:)

"BY THE COURT: All right. I am now officially warning Mr. Ayre he is not to make any personal references toward Mr. Bernsen no matter what Mr. Bernsen does.

"MR. BERNSEN: Judge, I didn't do anything.

"BY THE COURT: *All right, I am fixing to hold you in contempt in just about five minutes.*

"MR. BERNSEN: *For what, Your Honor?*

"BY THE COURT: *For your arrogance, your indifference and disrespect to this court. I've got my book out and I am fixing to do it in just a few minutes.*

"*Now, if you all don't get off this and start talking about this lawsuit and not about each other, I am going to hold both of you in contempt. I mean it. I am tired of it. It is the most disrespectful thing I have ever seen done in the profession of lawyers, particularly as capable as you all are.*

"*Do you all understand me?*

"MR. BERNSEN: Yes, sir, I understand.

"BY THE COURT: You all get off of this. I am tired of this, you all talking about yourself as lawyers.

"Talk about your evidence and your case, not about each other.

"MR. BERNSEN: But, Your Honor—

"BY THE COURT: (Interrupting)

"Now, David, I am just telling you, you are fixing to be in contempt. Do you understand me?

"MR. BERNSEN: Yes, sir, I understand you.

"BY THE COURT: All right. Do you understand me, Terry?

"MR. AYRE: Yes, sir.

"BY THE COURT: You put all that down, Mrs. Labove.

"*I am fixing to get a-hold of me a judge—not from Beaumont I promise you. I'll bring a judge in here from somewhere else. I promise you I am not going to forget this. All right.*

"MR. BERNSEN: Forget what, Your Honor? I—I—

"BY THE COURT: These personal attacks you have made on this man.

"MR. BERNSEN: Your Honor, he is not—

"BY THE COURT: It's disgraceful. All right. Sit down over there now.

"MR. BERNSEN: Your Honor, I—

"BY THE COURT: I've had enough now, David. You listen to me.

"MR. BERNSEN: I am listening, Judge.

"BY THE COURT: You better listen to me good.

"MR. BERNSEN: I am listening.

"BY THE COURT: All right. You want to blow this lawsuit—All right, bring the jury back, Mr. Droddy.

"You go on with your case, Mr. Ayre, but I want to stop this personal reference from you lawyers. I can't help you all's problems but you are not going to do it up here."

The record does not explain to us the patient long-suffering trial judge's comment:

"I am fixing to get a-hold of me a judge—not from Beaumont I promise

you. I'll bring a judge in here from somewhere else...."

*TEX.R.CIV.P. 269(d), (e), (f), and (g)* states as follows:

"(d) Arguments on questions of law shall be addressed to the court, and counsel should state the substance of the authorities referred to....

"(e) Arguments on the facts should be addressed to the jury, when one is impaneled in a case that is being tried, under the supervision of the court. Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel. Mere personal criticism by counsel upon each other shall be avoided, and *when indulged in shall be promptly corrected as a contempt of court.*

"(f) *Side-bar remarks, and remarks by counsel of one side, not addressed to the court,* while the counsel on the other side is examining a witness or arguing any question to the court, or *addressing the jury, will be rigidly repressed by the court.*

"(g) *The court will not be required to wait for objections to be made when the rules as to arguments are violated;* but should they not be noticed and corrected by the court, opposing counsel may ask leave of the court to rise and present his point of objection. *But the court shall protect counsel from any unnecessary interruption* made on frivolous and unimportant grounds." (Emphasis added)

There were some parts of the arguments by both counselors that discussed the evidence before the jury. There were some other parts of the same arguments that could have been construed by the jury or certainly could have been construed by the trial judge to be an appeal to bias or prejudice. Of course, under the rules, the judge had strictly charged, admonished and instructed the jury not to decide the case on bias or prejudice. We conclude that the trial judge was making a conscientious, patient, and judicious effort to enforce the rules of the Supreme Court concerning jury argument as well as the instructions set out in his charge. We conclude that it is evident that both counselors violated these rules. Reviewing and analyzing the entire record, we cannot say that reversible error was committed in the jury argument of defense counsel. Both attorneys at some part in the argument did apologize to the court and the jury. We conscientiously think that the jury could and did follow and weigh the evidence in this case. That was their right and duty. We quote from *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979):

"In the case of improper jury argument, the complainant must prove a number of things. He has the burden to prove (1) an error (2) *that was not invited or provoked,* (3) that was preserved by the proper trial predicate, *such as an objection, a motion to instruct, or a motion for mistrial,* and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. 3 McDonald, Texas Civil Practice sec. 13.17.2 (1970). There are only rare instances of incurable harm from improper argument. The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a *reversal must come from an evaluation of the whole case,* which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." (Emphasis added)

We decide that there was mutual and reciprocal provocation. This provocation arose before arguments and continued during the arguments. We conclude that the jury's verdict was grounded on the record and evidence before it, rather than the arguments to the jury.

*Point of Error 1–B, Hearsay Evidence*

Appellant argues that immaterial hearsay evidence was before the jury and contributed to the jury's prejudice. We disagree. This point attacks Lee Robicheaux's testimony concerning Short's admissions that he could repair the impact wrench in question. Although a conflict developed in the evidence, there was testimony of probative force that Short had changed his position during the long course of this litigation respecting his ability to repair the impact wrench. It was a matter for the jury to consider and weigh. The string of testimony involved, or attempted to involve, an impeachment of Short as well as certain admissions of Short. Robicheaux, Short's employer, had testified:

"A: [MR. ROBICHEAUX] We had two or three different wrenches that wasn't working at the time and we had some that was broke. I ask Dwayne [Short] to fix them. I told him he could fix them because we was running short on tools or something. He said, 'Well, I can take it home and fix it.'

. . . .

"Q: [MR. BERNSEN] Did you talk with Mr. Short about going into the handle on that wrench?

"A: [MR. ROBICHEAUX] I ask him if he was aware of what it took to fix them and he said yes, he could fix it.

Later:

"Q: [MR. BERNSEN] When you talked with Mr. Short about repairing the wrench, you all talked about whether he knew how to get in the handle and fix it, didn't you?

"A: [MR. ROBICHEAUX] If he could, yeah.

"Q: [MR. BERNSEN] And he said that he could.

"A: [MR. ROBICHEAUX] Yeah, he said if the cord was pulled loose he knew how to fix it."

There was no objection made to this line of testimony. We decide that the statements attributed to Short fall within a classic exception of the hearsay rule. We deem the statement to be an admission of a party. 1A Ray, *TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL* sec. 1121 (Texas Practice 3rd ed. 1980) states:

"An admission ... may be defined as any statement made ... by one of the parties ... which amounts to a prior acknowledgment by such party that one of the facts relevant to the issues is not as he now claims ... [A]ny statement or conduct of a party which is inconsistent with the position taken by him at the trial may be given in evidence against him...."

This proposition is well settled. Professor Ray takes the position that the overwhelming weight of authority is to the effect that these admissions can be properly used to prove the truth of the facts asserted. They are certainly admissible for purposes of impeachment of the litigant as to his credibility; hence, used to impeach the contention made by the admitter-litigant at trial. Again, it is the jury's duty to weigh this evidence.

■ *TEX.R.EVID. 801(e)(2)* now declares that such a statement is "not hearsay". In relevant part, the *TEX.R.EVID. 801(e)(2)* reads:

"Rule 801.

"(e): Statements which are not hearsay. A statement is not hearsay if—

"(2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement...."

We conclude, under the modern rules of evidence, this testimony was not immaterial nor hearsay. Further, we conclude that the answers to the special issues returned by the jury are not evidence, per se, of any prejudice, bias or improper motive. We fail to find that the jury in this case entertained adverse prejudice, bias or improper motive against the Appellant.

*Point of Error 2—Verdict Being Against The Great Weight And Preponderance of the Evidence*

■ Next, the Appellant argues that the trial court erred in failing to grant his motion for new trial because the verdict of the jury was against the great weight and preponderance of the evidence. The initial and perhaps the main thrust of his argument is that the jury returned answers of

zero or nothing to all of the special issues concerning Short's damages. In any case, the answers were illogical. The special issue on past medical expenses and hospital care simply asked what was the reasonable expenses for necessary medical and hospital care received by Short in the past for the treatment of his injuries from the occurrence in question. The jury answered zero. The causation factor was omitted from both the past and future medical expenses and hospital care issues.

But, since the jury did not find liability against Black & Decker, we conclude that the failure of the jury to award him damages is not error. The trial jurors, as they were affirmatively charged by the court, acted as the sole judges of the credibility of the witnesses and the weight to be given their testimony. *Royal v. Cameron*, 382 S.W.2d 335 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.). We have reviewed the entire record before us. We have analyzed the entirety of the jury's verdict. We decide that no bias, prejudice or improper motive, by the jury, against Short, is shown. We also conclude that the award of "zero" to each damage issue, under this record, does not show bias, prejudice or improper motive. *Johnson v. Whitehurst*, 652 S.W.2d 441 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.); *Gaut v. Quast*, 505 S.W.2d 367 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.).

In fact, *Southern Pine Lumber Co. v. Andrade*, 132 Tex. 372, 124 S.W.2d 334, 335 (1939), is of special significance to this Ninth Court of Appeals. That case was based on an automobile-truck collision where the plaintiff was found, by the jury, to have been driving his automobile in excess of 45 miles an hour and also at a greater rate of speed than an ordinary, prudent person would drive. These findings were followed by the jury's further findings that each was a proximate cause of the collision. Then the jury answered "Nothing" to this issue, submitted by Andrade, III:

" 'What sum of money, if paid now in cash, will fairly and reasonably compensate plaintiff for the injuries sustained by him, if any, as a result of the collision?' "

The trial court entered a judgment that Andrade take nothing. The Beaumont court then decided, although the verdict of the jury convicting Andrade, III, of contributory negligence was supported by the evidence, to reverse the trial court's judgment. Our court reasoned that, since the jury answered that Andrade suffered no damages, which was contrary to the undisputed evidence, the answer must have, in some manner, been induced by some improper influence. Further, our court said that it was reasonable to conclude that the same improper influence entered into the findings with respect to contributory negligence. 94 S.W.2d 583. But the Commission of Appeals of Texas, Section B, reversed our court and held as follows, in *Southern Pine Lumber Co., supra,* at page 335:

"These findings of the jury, so supported, required the rendition of judgment in favor of plaintiff in error [Southern Pine Lumber Co.], the defendant in the trial court, regardless of the extent of the injury suffered by defendant in error [Andrade, III]; and in view of these findings, it would have been the duty of the trial court to render the judgment that it did render, even if the jury had answered that defendant in error was damaged in a substantial amount *or even if the jury had failed to answer the issue as to damages.* That issue became immaterial when the jury found that defendant in error was guilty of contributory negligence that proximately caused the collision.

"There is nothing in the record suggesting that the jury was induced by prejudice or by some improper influence to answer as it did the issue as to damages, unless it is the bare fact that the answer is contrary to the undisputed evidence, which shows that defendant in error suffered severe physical injuries. The action of a jury in answering an issue directly contrary to the undisputed evidence may be cause for suspicion that the answer was induced by prejudice or by improper influence. But we would not be justified in assuming that prejudice or improper influence was responsible for the jury's answers convicting

defendant in error of contributory negligence when there is in the record substantial evidence supporting those answers and no evidence that prejudice or improper influence entered into or caused them...." (Emphasis added) We conclude that the rule set out in *Southern Pine Lumber Co., supra,* is determinative and disposes of this second point. We adhere to it. We overrule the Appellant's points of error. The judgment below is affirmed.

 We respectfully suggest to the Supreme Court that trial judges be given more power and discretion in holding the lawyers in contempt; especially where, as here, the trial lawyers repeatedly violated the trial court's rulings.

AFFIRMED.[1]

---

1. We perceive that the jury, based on probative evidence, found that the impact wrench was not defective when it left the control of Black & Decker, with the exception that the warning was found by the jury to be inadequate; but, the jury reached the result that the Appellant failed to prove, by a preponderance of the evidence, that the inadequate warning was a proximate cause of his injuries. This conclusion by the jury could have been reached by them from the testimony of Short, himself. The findings on Special Issues 10 and 11, we think, disprove bias and prejudice on the part of the jury. In Special Issues 10 and 11, the jury found that Black & Decker failed to provide an adequate warning on the impact wrench and that such failure was negligence.

In Special Issue No. 12 the jury failed to find that such negligence was a proximate cause of the occurrence in question. The jury answered Special Issue No. 12 "No". All of the jury's findings on the liability issues were supported by ample evidence.